DRAPER COMMUNICATIONS, INC. and WBOC, Inc., Delaware corporations, t/a WBOC–TV, Plaintiffs,

v.

DELAWARE VALLEY BROADCAST-ERS LIMITED PARTNERSHIP, Defendant.

Court of Chancery of Delaware, Sussex County.

Submitted: Nov. 22, 1985.

Decided: Dec. 17, 1985.

Randy J. Holland of Morris, Nichols, Arsht & Tunnell, Georgetown, for plaintiffs.

Roderick R. McKelvie and Stephen E. Jenkins of Ashby, McKelvie & Geddes, Wilmington, for defendant.

## OPINION AFTER TRIAL

JACOBS, Vice-Chancellor.

On October 18, 1985 the plaintiffs, as owners of a television station which for the past 30 years has broadcasted under the call letters "WBOC–TV," brought this action to enjoin the defendant, as owner of a television station that will begin broadcasting within the next few weeks, from using the call letters "WBOT–TV." The parties engaged in expedited discovery and thereafter agreed to consolidate plaintiffs' motion for a preliminary injunction with the final hearing on the merits. The trial took place on November 18 and 19, 1985. This is the decision of the Court after trial.

## I. BACKGROUND OF THE DISPUTE

### A. *WBOC-TV*

The plaintiffs, Draper Communication, Inc., and its wholly-owned subsidiary, WBOC, Inc. are Delaware corporations engaged in the business of television broadcasting under the trade name "WBOC-TV."[1] Under prior ownership, WBOC-TV began operation as the first television station on the Delaware Peninsula in 1954. In 1980, the assets of the television station known as "WBOC-TV," including the call letters "WBOC," were acquired by an entity owned by Thomas Draper, President of plaintiff Draper Communications. That entity subsequently changed its name to WBOC-TV, Inc., which presently owns the call letters "WBOC-TV."

WBOC-TV is headquartered in Salisbury, Maryland, and has significant broadcast and business facilities in Delaware. WBOC-TV owns and operates the largest television tower on the Delmarva Peninsula. The television market served by WBOC-TV covers ten counties located in the States of Delaware, Maryland and Virginia. From the tower located in Sussex County, Delaware, plaintiffs' broadcast signal extends as far north as Smyrna (Kent County), Delaware, to and as far south as Accomac, Virginia, and reaching south and west from the Atlantic Ocean to the Chesapeake Bay.

In addition to serving homes that have antennas, WBOC-TV reaches many homes that are served by cable television. In fact, WBOC-TV is considered to be in a cable television intensive area, since more than fifty percent of the homes in its area of service have television cable. WBOC-TV has been assigned to Channel 16 by the Federal Communications Commission (FCC) and therefore is received on Channel 16 by homes with television antennas. Where WBOC-TV is received on cable television, the situation is more complex. Because cable television operators are free to assign whatever cable channels to a broadcaster as they choose, on cable television WBOC-TV appears on seven separate channels (Channels 2, 3, 4, 6, 7, 9 and 16) within its tri-state broadcast area. And within Kent County alone, WBOC-TV appears on three channels: 2 (Dover and Camden), 3 (Felton and Harrington) and 4 (Milford). The significance of that fact will become clear at a later point.

The television broadcasting industry, by its very nature, is advertiser-oriented. Television stations are largely totally dependent upon advertiser revenues for their economic well being. A television station has essentially one product to sell to advertisers: commercial "time" on its particular broadcasting channels, during which the advertisers will promote their particular product or service. Television stations which broadcast in the same "market" are, in essence, competing for the same advertising dollars. What induces an advertiser to buy time on a particular station is the "market" served by that station, *i.e.*, the number of television users within that station's broadcast area who are likely to view (and hopefully to respond favorably to) the advertiser's commercial message. This reality of the television marketplace requires television broadcasters to promote their television stations to both advertisers and viewers simultaneously.

A television station such as WBOC-TV promotes itself to advertisers on the basis of the type and size of the "market" it commands. Thus, if a station can persuade an advertiser that its programs are regularly viewed by the type of viewers that form the advertiser's "target audience," and that the station's broadcast signal will reach a large number of such viewers, advertisers will be motivated to advertise on that particular station. To determine the reliability of a television station's claims as to the market it serves, rating services such as A.C. Nielson and Arbitron, which use generally accepted market measure-

---

1. Throughout this Opinion the plaintiffs are sometimes collectively referred to as "WBOC-TV," and the defendant is sometimes referred to as "WBOT-TV."

ment techniques, have developed. Television stations such as WBOC–TV use promotional devices which include brochures that describe the nature and scheduling of the station's programming, and the number of television households and viewer population which comprise the television station's market.

Since a television station's attractiveness to advertisers depends upon its viewer following, the station must promote itself to viewers as well. Viewer promotion is based upon the type and quality of the programming that the station has to offer. Since WBOC–TV is a CBS Network affiliate, it is able to market the programming made available nationally by that network. And on a local level, WBOC–TV's hallmark and area of strength is its local news and information programming, through its "Delmarva Report," of events occurring throughout the Delmarva Peninsula.

So important to WBOC–TV is the activity of self-promotion that over the past thirty years, it has invested considerable capital and effort towards that objective. According to its President, Mr. Draper, WBOC–TV spends $150,000 per year to promote itself through outside advertising, and, in addition, it utilizes considerable commercial time on its own channel for self-promotion—time which, if purchased by independent advertisers, would translate to almost $1 million of revenues.

The foregoing discussion is, essentially, prologue to the focal point of this case: call letters. As previously stated, since 1954 the plaintiffs' station has operated under the call letters "WBOC–TV." Those call letters have become an indispensable part of the station's self-promotional strategy. After thirty years of continued use, the call letters WBOC–TV have acquired a "secondary meaning"[2] which represent, in effect, that station's identity. Stated differently, the call letters "WBOC–TV" are a trade-

mark that has come to represent a particular quality and kind of programming in the television broadcasting marketplace, and has served to identify the source of such programming as being the television station and enterprise owned by the plaintiffs.

All of plaintiffs' efforts to promote their television station emphasize the call letters "WBOC" or "WBOC–TV." Those letters are always prominently displayed either alone or in conjunction with other identifying attributes, such as the "Delmarva Spirit," "Delmarva Report" or "Channel 16." By way of example, outside advertisements promoting WBOC–TV take many forms, *e.g.* newspaper inserts, and public relations promotions which link WBOC–TV with the "Missing Children" campaign or the McDonald's "safe kid's tip." WBOC promotes itself as WBOC–TV through other media, such as the Delaware State News, the Wilmington Morning News and in TV Guide. WBOC–TV also makes extensive use of its CBS network affiliation to link that network's programming with its call letters. Thus, in 1984 WBOC–TV customized the CBS Fall Premiere promotional material by adding, whenever possible, its call letters "WBOC" to the CBS material (*e.g.* "WBOC Program Schedule," "WBOC and CBS News," "WBOC Weekdays," "WBOC for Children," "WBOC and Sports," "WBOC Weekend," etc.). As a CBS affiliate, WBOC also has the opportunity to purchase theme music for customizing. This year, CBS had Kenny Rogers prepare a promotional song emphasizing the CBS slogan "We've Got the Touch." WBOC–TV chose to customize the Kenny Rogers promotional song by adding "B–O–C, Del-marva, and W–B–O–C," to emphasize for the viewer that "We've Got the Touch on W–B–O–C." Moreover, when WBOC–TV's cameras cover the news on the Delmarva Peninsula, they are prominently marked "WBOC–TV." WBOC–TV's call letters are

---

**2.** "Secondary meaning" refers to "that quality of a name's public recognition which causes those who are exposed to it in the marketplace to assume that the goods or services associated

with the name derive from a single source." *Bank of Delaware Corporation v. First National Bank of Georgetown,* Del.Ch., C.A. No. 7147, Brown, C. (October 31, 1983), slip op. at 7.

a valuable asset to plaintiffs and form an integral part of their promotional strategy.

## B. *WBOT–TV*

At this juncture it is relevant to discuss the background leading up to the defendant's efforts to construct a television station that seeks to broadcast on Channel 61 under the call letters "WBOT–TV."

In 1983 the FCC granted a construction permit to the Reverend and Mrs. Elmer Lindale to build a television station in Wilmington, Delaware, which would broadcast over Channel 61. Before any construction efforts could be started, Mrs. Lindale developed a serious illness from which she ultimately died in 1984. Thereafter, when Rev. Lindale was again able to focus upon the television station, he realized that considerable capital would be needed to finance the project. To assist him raising that capital, Rev. Lindale called upon his son-in-law, Mr. Daniel Slape, who was then employed as an investment banker by E.F. Hutton in Portland, Oregon. Using his investment banking background and contacts, Mr. Slape engaged the services of a Seattle, Washington investment banking firm to develop a financing method. The method chosen was to create a limited partnership, Delaware Valley Limited Partnership, which became the owner of the Lindales' license to construct the television station. Mr. Slape and Rev. Lindale also formed Delaware Valley Broadcasters, Inc., which entered into a management contract with Delaware Valley Limited Partnership to build and operate the station. Thereafter, Mr. Slape decided to work full time on the project. In April 1984, he resigned from E.F. Hutton, and in August, 1984, he moved to Wilmington with his family and became President of Delaware Valley Broadcasters, Inc.

In addition to raising capital for the new venture, it became necessary for the defendant to obtain zoning approval to build a broadcasting tower. That problem turned out to be more nettlesome than had been originally anticipated, and cost the defendant an additional $300,000. As a result, the new venture still found itself short of the capital it needed, and, as of the time of trial, was still seeking to attract additional investment capital.[3]

By that point, Mr. Slape and his father-in-law were able to turn their attention to developing a strategy for marketing the television station, a station which was then (and still is) in the process of construction.

Mr. Slape began focusing in earnest on how the new station should position itself in the marketplace in June, 1985. Ultimately he determined that the station would operate as an independent (*i.e.*, non-network affiliated) UHF entertainment and sports channel, with an emphasis upon syndicated television movie "reruns." The new station would broadcast within the Philadelphia "area of dominant influence" but with primary emphasis on Wilmington, Delaware.

Having thus determined what type of programming the station would broadcast and what "market" area it would serve, the defendant next considered how the station would promote its identity in the marketplace. It was in that context that the subject of call letters became critical.

The call letters originally assigned to Channel 61 were "WDVI–TV." During the period that Mr. Slape was formulating his marketing strategy for the new station, he decided to change those call letters, so as to enable the station to put its "best foot forward" in the marketplace, by "[starting] all over again" with a new image. A new image was needed for two reasons. According to Mr. Slape, members of the Wilmington business community with whom he had come into contact, had made remarks which evidenced a widespread per-

---

**3.** The broker whom Mr. Slape engaged to obtain additional investors had apparently informed Mr. Draper that WBOT–TV was for sale. During his testimony, Mr. Slape acknowledged that, for the right price, he would be willing to consider selling the station, but expressed doubt as to whether any buyer would be willing to meet his price.

ception that the new station would be a religious station. That perception was not correct. Moreover, it had been suggested that the call letters "WDVI" might be confused with the call letters of Channel 6 in Philadelphia, which were "WPVI." To solve the embryonic station's perceived image problem, and to avoid any potential for call letter confusion, the defendant decided to change the call letters.

The governmental agency which designates call letters for all entities licensed to broadcast is the FCC. 47 U.S.C. § 303(o). The defendant initiated the process of changing the call letters by submitting to its FCC counsel a list which contained between 10 and 15 alternative call letters. Counsel were instructed to ascertain from the FCC which of the proposed call letters were available. FCC counsel returned the list to Mr. Slape with the advice that none of the listed call letters were available. The defendant then developed a second list containing multiple alternatives, one of which was "WBOT." According to Mr. Slape, "WBOT" was chosen because it could be identified with the tag line *"We've got the Best Of Times,"* a slogan intended to signal that WBOT's television re-runs came from the "best" era of television movies, *i.e.,* the 1960's and 1970's. When FCC counsel reported back that "WBOT" was available, the defendant applied for a license to change its call letters to "WBOT," and the FCC granted their application effective August 12, 1985. On September 11, 1985, the defendant publicly announced that a new television station would be broadcasting under the call letters "WBOT–TV," and that its market would include central Delaware, including Kent County.

C. *Events Leading Up To This Lawsuit*

The record is clear, and defendant does not dispute, that WBOC and WBOT will broadcast in an overlapping service area or viewing audience, namely, Kent County. Also undisputed is the fact that the defendant intends, and already has begun, to solicit television advertising in direct competition with the plaintiffs. On October 22, 1985, Leigh Primavera, an advertising representative of WBOT–TV, solicited advertising from Theresa Polischuk, the advertising representative of the Dover Mall, which was an advertising client of WBOC–TV. When Ms. Primavera concluded her meeting with Ms. Polischuk, she said that she (Ms. Primavera) would be "roaming around" Dover for more advertisers. Sometime thereafter, Ms. Primavera sent Ms. Polischuk a follow-up letter which included promotional material indicating that WBOT–TV would be directing its programming towards viewers in central Delaware.

Kent County, Delaware is an important part of WBOC–TV's market. Kent County has 34,860 television homes representing almost 104,000 viewers. It is the location of plaintiffs' only other permanent office besides its new headquarters in Salisbury, Maryland. WBOC–TV has 7 full time employees located in Dover, Delaware, and is presently constructing a microwave transmitter in Dover. According to Mr. Draper, between 10–12% of WBOC–TV's revenues are generated from Kent County.

At no time before or after it selected the call letters "WBOT–TV" did the defendant make any effort to notify WBOC–TV of its intentions, nor did it attempt to ascertain the plaintiffs' position on the subject of call letter confusion. As a result, WBOC–TV's Mr. Draper did not learn of WBOT–TV's existence until he read a September 11, 1985 newspaper article which reported that WBOT–TV would be going on the air "late this fall." [4]

Upon learning of "WBOT–TV's" existence and call letters, Mr. Draper contacted the defendants and spoke with Patrick Pierantozzi, WBOT's general manager. Mr. Pierantozzi advised Mr. Draper that

---

4. The newspaper article also made specific reference to the possibility that the call letters

"WBOT" might be confused with "WBOC."

WBOT proposed to serve a market area which overlapped WBOC–TV's service area in Kent County, Delaware. Mr. Draper took the position that WBOT–TV should change its call letters. Mr. Pierantozzi responded that it was unlikely that the defendant would do that, since it had already changed its call letters once before to avoid confusion with Philadelphia station "WPVI." Mr. Draper advised that the call letters "WBOC–TV" belonged to his station, and that he would consult with legal counsel if defendant would not change its call letters voluntarily, as it had done with respect to WDVI. In a later telephone conversation, Mr. Pierantozzi confirmed to Mr. Draper that the defendant would not change its call letters, and that it would proceed with its plans to broadcast as "WBOT–TV."

This lawsuit followed.

## II. PLAINTIFFS' ENTITLEMENT TO AN INJUNCTION

### A. Standards For Injunctive Relief

This matter is submitted on a combined application for preliminary and permanent injunctive relief. The standards for granting a preliminary injunction are well established. The moving party must demonstrate that: (1) there is a reasonable probability that it will succeed on the merits of its claims; (2) it will suffer irreparable harm if injunctive relief is not granted; and (3) the harm that would result if an injunction does not issue outweighs the harm that would befall the opposing party if the injunction is issued. *Gimbel v. Signal Cos., Inc.*, Del.Ch., 316 A.2d 599, 602–603, *aff'd*, Del.Supr., 316 A.2d 619 (1974); *Wylain, Inc. v. TRE Corp.*, Del.Ch., 412 A.2d 338, 342 (1979); *Thomas C. Marshall, Inc. v. Holiday Inn, Inc.*, Del.Ch., 174 A.2d 27, 28 (1961). Where a permanent injunction is being sought, the standards are identical, except that actual, rather than probable, success on the merits is the relevant criterion. *See Galella v. Onassis*, 353 F.Supp. 196, 235–236 (S.D.N.Y.1972), *modified on other grounds*, 487 F.2d 986 (2d Cir.1973); 43 C.J.S. *Injunctions* § 16 (1978).

In this case, only one of the above three criteria, success on the merits, is contested. The remaining two criteria are not, and as to them, the uncontroverted evidence clearly favors the plaintiffs. For that reason irreparable harm and the balancing of equities are first addressed.

### B. Irreparable Harm and Balancing of Equities

If the plaintiffs succeed on the merits of their claim that the call letters "WBOT–TV" will likely be confused with the plaintiffs' call letters "WBOC–TV," it follows that such confusion will cause irreparable injury to the plaintiffs. In *Bank of Delaware Corporation v. First National Bank of Georgetown, supra*, slip op. at p. 10, Chancellor Brown preliminarily enjoined the use of the name "First National Bank of Delaware" on the ground that it would likely be confused with "Bank of Delaware," a tradename that over the prior 25 years had developed a secondary meaning and was entitled to protection. Having found that the plaintiffs had shown a likelihood of success on the merits, the Court held that:

> "... it follows almost by necessity that plaintiff has also demonstrated a likelihood of irreparable injury to its business ... [absent] a preliminary restraint against the use of the potentially confusing name ..."

The defendant advances no serious argument to the contrary. Although it obliquely suggests that the plaintiffs must show some actual loss, the suggestion flies in the face of both case law and logic. *Carlton's Men's Wear, Inc. v. Carlton Hotel Stores, Inc.*, Del.Ch., C.A. No. 1028(S), Walsh, V.C. (August 15, 1985) at pp. 6–7. The purpose of an injunction is to prevent irreparable harm before it occurs, not after. Since WBOT–TV has not yet begun to broadcast, it would be impracticable, if not impossible, to assess in specific terms what adverse

impact would be caused by the defendant's public use of the call letters WBOT–TV.

Next, in balancing the relative harm and hardships (again, assuming that plaintiffs were to prevail on the merits), the potential harm of irreparable injury to plaintiffs' business reputation, goodwill and the strength of its mark would clearly outweigh any hardship that would be visited upon the defendant. The plaintiffs have invested $150,000 per year, plus an additional $1,000,000 of their station's time, to promote the WBOC–TV call letters—a mark that for 30 years has existed as the station's identifying attribute. The defendant, on the other hand, has invested up to now only $32,000 to promote its station, and it has not yet begun to broadcast. Accordingly, the defendant's call letters have not yet developed any public significance, and if they were required to be changed, that could be done simply and inexpensively with no significant interruption of defendant's business. *See Pathfinder Communications Corp. v. Midwest Communications Co.*, 593 F.Supp. 281, 289 (N.D.Ind.1984). If the defendant were ordered to change its call letters, the problem resulting from an involuntary change of call letters would be one not so much of economics, but of public relations. Having publicly begun to promote its station as "WBOT," the defendant, if now required to start all over again with new call letters, would have to deal with a possible public perception that it had made a "false start." While that might occasion some embarrassment and short term expense, both would be temporary. In any event, that would hardly outweigh the harm that plaintiffs would endure, should they prevail on the merits yet be denied injunctive relief. Assuming their success on the merits, the balance of hardships favors the plaintiffs.

The real controversy in this case relates to the merits of the plaintiffs' claims—that is, the issue of whether the call letters "WBOT–TV" are so similar to the call letters "WBOC–TV" as to be likely to cause confusion in the minds of the viewing and advertising public. It is in that arena that the parties have chosen to wage their battle. Accordingly, I turn to the merits.

## C. *The Merits Of Plaintiffs' Claims*

By way of preface, it is helpful to explain how a dispute that would seem to fall within the domain of the FCC comes to be heard in this Court. Until 1984 disputes over call letters were exclusively within the jurisdiction of the FCC. That agency would grant requests for call letters, unless another station had the same call letters, or the requested call letters were not in good taste, or were so phonetically and rhythmically similar to existing call letters of stations in the same area such that confusion would likely result. If a licensed station objected to the approval of another station's call letters, the FCC would adjudicate that dispute. In 1984 the FCC changed its rules, with the result that the FCC will grant a request for a particular call sign if it is "available," but will no longer serve as a forum for resolving objections to call letter requests. Such disputes must now be resolved in the appropriate local judicial forum, wherein the law of the local forum is applicable. 47 C.F.R. § 73,3550(g) (1984); *Pathfinder Communications Corp. v. Midwest Communications Co., supra*, 593 F.Supp. at 283.

The plaintiffs rely upon two legal theories: (1) that the defendant's proposed use of the call letters "WBOT–TV" constitutes common law trademark or tradename infringement; and (2) that such conduct constitutes a violation of the Deceptive Trade Practices Act. 6 *Del.C.* § 2531, *et seq.* Under the common law of trademark or tradename infringement, a trademark or tradename that acquires specific significance either through prior exclusive use in the same market, or through having acquired a secondary meaning, is entitled to protection from use by others. Specifically, the later use by another of a trademark or tradename will be restrained if the later-used trademark or tradename is so similar to the prior-used trademark or tradename

as to create a likelihood that the marks or names will be confused. The critical concept in this area is "likelihood of confusion." If likelihood of confusion is shown, an injunction will issue without any need to show any actual loss, or diversion of the plaintiff's business, or intent on the part of the defendant to inflict injury or damage. *Carlton's Men's Wear v. Carlton Hotel Stores, Inc., supra,* slip op. at pp. 6–7; *Air Reduction Company v. Airco Supply Company,* Del.Ch., 258 A.2d 302 (1969); *Bank of Delaware Corporation v. First National Bank of Georgetown, supra,* slip op. at p. 10.

The Deceptive Trade Practices Act, at least as to those cases involving trademarks or tradenames, codifies the common law. Under the Act, "[a] person engages in a deceptive trade practice" if he performs any one of a series of enumerated acts, including acts that cause "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services. . . ." 6 *Del.C.* § 2532(a)(2). To prevail under the Act, "a complainant need not prove competition between the parties or actual confusion or misunderstanding." 6 *Del.C.* § 2532(b). Likewise, "proof of monetary damage, loss of profits, or intent to deceive, is also not required." 6 *Del.C.* § 2533(a).

The defendant does not dispute that the foregoing accurately states the rules of law which are applicable to this case.[5] The defendant's position, simply put, is that the plaintiffs have failed to prove an essential element of their case under either of their legal theories, namely, the likelihood ". . . that the consuming public will be confused into believing that [WBOT's broadcast] comes from the same source as [WBOC's broadcast]." *Pathfinder Communications Corp. v. Midwest Communications Co., supra,* 593 F.Supp. at 283 (quoting *Henri's Food Products Co. v. Kraft, Inc.,* 717 F.2d 352, at 354 (7th Cir.1983)). Specif-

ically, the defendant contends that even though its call letters are phonetically similar to the plaintiffs' call letters, the plaintiffs have not proved that such similarity is likely to confuse the listening public or advertisers over which station they are viewing or favoring with their advertisements. Defendant further contends that, in fact, the consuming public will not be confused by any call letter similarity.

■■■ In evaluating the plaintiffs' claims, several factors are relevant to the "likelihood of confusion" issue. They are: (i) the degree of similarity between the marks, (ii) the similarity of products for which the name is used, (iii) the area and manner of concurrent use, (iv) the degree of care likely to be exercised by consumers, (v) the strength of the plaintiffs' mark, (vi) whether there has been actual confusion, and (vii) the intent of the alleged infringer to palm off his products as those of another. *Pathfinder Communications Corp. v. Midwest Communications Co., supra,* 593 F.Supp. at pp. 283–287; *see Helene Curtis Industries v. Church & Dwight Co., Inc.,* 560 F.2d 1325, 1330 (7th Cir.1977), *cert. denied,* 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978). In this case, those combined factors compel a finding that the defendant's proposed use of the call letters "WBOT–TV" will cause a likelihood of confusion.

#### (i) *Degree of Similarity*

The similarity of the call letters "WBOC–TV" and "WBOT–TV" is not disputed. In its pretrial memorandum, the defendant stipulated that the two sets of call letters are "overwhelmingly similar on phonetic grounds." At the trial Mr. Slape conceded that the call letters were similar, as the plaintiffs' expert, Dr. Dinnsen, had testified. The plaintiffs' trial expert was Daniel A. Dinnsen, a Professor of Linguistics

---

5. In its pretrial and post-trial memoranda, defendant appears to suggest that the plaintiffs must prove actual confusion and/or actual harm in order to obtain injunctive relief. To the extent such arguments are advanced, they are based upon an erroneous legal premise and, hence, are rejected.

at the University of Indiana, and a leading expert in the areas of phonology and phonetics. As a result of his spectrogram (voiceprint) and phonetic analyses of the two sets of call letters, all of which were the subject of extensive trial testimony, Professor Dinnsen found an "overwhelming" phonetic similarity between two sets of call letters, which created a strong likelihood of confusion. Professor Dinnsen testified that of the 17,576 logically possible sets of call letters east of the Mississippi, only 7 sets were as confusable as the two sets involved here, and no call letters were more similar to "WBOC" than was "WBOT."

Defendant argues that the phonetic similarity of the call letters is not probative of a likelihood of confusion, for two reasons. First, defendant says, Professor Dinnsen's analysis is valid only if it be assumed that the call letters will be broadcast in isolation. That assumption, defendant argues, is incorrect, because call letters are always communicated in conjunction with other information such as the station's channel number, its location, its slogan and (when made part of a jingle), music. Those additional identifying characteristics are sufficient to overwhelm any similarities between the call letters themselves. Second, defendant argues, any similarity between call letters will not confuse television viewers or advertisers, because viewers and advertisers identify television stations by channel number, not by call letter. The channel number of WBOT (Channel 61) is clearly distinguishable from the channel number of WBOC (Channel 16), and WBOT–TV intends to emphasize its channel number, not its call letters, in its promotional efforts. Defendant's difficulty, however, is that neither contention is supported by the weight of the evidence.

As for the defendant's first argument, it is correct to say that a television station's call letters are usually not communicated in isolation, but rather are broadcast as part of a more comprehensive information package.[6] But the conclusion that defendant seeks to draw from that premise does not necessarily follow as a matter of logic or evidence. Even if the call letters were presented together with channel numbers, slogans and theme music, the likelihood of confusion would remain, because of the phenomena of "speech perception" and "paired associations." By "speech perception," Professor Dinnsen meant the tendency of a television viewer to see what he believes he has heard. A viewer hearing the call letters "WBO*T*" will be unlikely to distinguish them from "WBO*C*," because phonetic differences near the end of a word are unlikely to be heard. That viewer will tend to hear "WBO*C*" when, in fact, the call letters being broadcast are WBO*T*." For the same reason, that same viewer will tend to believe that he has seen the call letters "WBO*C*," even though the visual image actually broadcast was "WBO*T*." Because of this "speech perception" phenomenon, a television viewer will have difficulty perceiving any distinction between the two sets of similar call letters.

Nor would that difficulty be eliminated by the presentation of those call letters in conjunction with the station's channel number, slogan, and theme music. For that to occur, a viewer would have to make a "paired association" between the call letters and the other identifying attributes, such as a channel number. According to Professor Dinnsen, actual experimental studies show that in general such paired associations are very difficult to accomplish, and in this particular case, paired associations would be especially difficult. That is because: (i) there is no intrinsic relation between such inherently different properties as call letters, shapes, and music, which, if paired, would facilitate the accurate recall of the call letters; (ii) background music would only tend to mask over any phonetic differences between "WBOC" and "WBOT"; and (iii) in this

6.  e.g., "WBOC–TV, Channel 16, Salisbury, Dover," "WBOC–TV 16," "16 Delmarva Spirit," or "We've got the best of times, WBOT, Channel 61."

case the channel numbers of the two stations, if paired with the call letters, would increase the likelihood of confusion, because the channel numbers contain the same digits, only reversed (Channel 16 vs. Channel 61). The relationship between those channel numbers suggests (incorrectly) that the two stations have a common ownership or source.[7]

At this juncture, it bears observation that the question of when the human senses will or will not misperceive the written and spoken word, is inherently a subject for expert testimony. The only expert testimony which addressed that particular subject was that of Professor Dinnsen, who testified that the likelihood of confusion created by similar call letters would be neither eliminated nor reduced by presenting the call letters together with the station's channel number, slogan, logo or theme music. Professor Dinnsen was credible and persuasive, and I credit his testimony. Because the defendant has failed to come forward with any evidence which controverts Professor Dinnsen's testimony on that particular issue, the defendant's first argument fails for lack of evidentiary support.

The defendant's second argument—that the similarity between the call letters will not cause confusion because television viewers identify a television station by channel number, not call letters—does find support, both in the documentary evidence and in the testimony of the defendant's trial expert, Professor Douglas Boyd. Professor Boyd, the Chairman of the Department of Communications at the University of Delaware, is an expert in mass communications.

Professor Boyd testified that television viewers tend to identify television stations by their channel number, not by call letters. Professor Boyd drew his conclusion from two sources. The first was a series of television station promotional advertisements appearing in the Wilmington *News Journal* and in the Philadelphia edition of "TV Guide." In those advertisements, the channel number of the television station being promoted was given prominence. The second source was a survey that Professor Boyd caused to be conducted by his graduate students, working under his supervision, for purposes of this lawsuit. The survey entailed contacting a random sample of 142 residents of New Castle County, Delaware, and asking them a series of questions. The two significant questions were what three television stations the respondents watched the most, and what radio stations they listened to the most. The overwhelming number of survey responses identified the television stations by channel number and identified the radio stations by call letters. Professor Boyd relied on this evidence as confirming his opinion that television viewers and advertisers tended to identify television stations by channel number, not by call letters.

It is that evidence which forms the strength of the defendant's case and which has proved most troublesome. I say that because Professor Boyd's concept that viewers tend to identify television stations by their channel number has a solid ring of truth to it. Indeed, it is consistent with the Court's own limited experience as a television viewer. Like Professor Dinnsen, Professor Boyd was a credible witness with impressive professional credentials. The difficulty with Professor Boyd's opinion, however, is that it fails to take into account certain other undisputed facts that are relevant to this important question. Those additional facts, when also considered, persuade the Court that Professor Boyd's conclusion may be valid, but only under limited

---

7. In *KGME Radio, Inc.,* FCC 78-735, 44 R.R.2d 719 (1978), the FCC refused to permit a radio station to change its call letters from KGMB to KGME. A change in call letters was required because of the transfer of control of KGMB–TV which had formerly been under common ownership with KGMB Radio. The FCC found that KGME was so phonetically and rhythmically similar to KGMB as to create a likelihood of listener confusion and an erroneous suggestion that the radio and television stations were still under common ownership.

circumstances which, unfortunately for the defendant, are not the circumstances critical to this case.

*First,* it is undisputed that not all television stations identify themselves by channel number. Professor Boyd conceded that in the decade of the 1980's, it is an acceptable marketing technique for a television station to emphasize its call letters. He estimated that perhaps as many as half of television stations self-promote by emphasizing call letters, and he acknowledged that call letters would be an important attribute of those stations' self-promotional strategy. Even Mr. Slape agreed that call letters would be a significant asset to the promotional strategy of television stations that emphasized call letters, and his testimony on that point is fully consistent with the defendant's own prior conduct: the defendant changed its station's call letters from WDVI to WBOT in order to change its public image.

*Second,* the practice of self-promotion by channel number is limited not only numerically, but also geographically, a fact that Professor Boyd's study also failed to take into account. In this case, that practice is prevalent in the Philadelphia market area (including New Castle County, Delaware, where Professor Boyd conducted his survey), but is not necessarily prevalent in the Delmarva market area, including Kent County, Delaware, which is the area served by WBOC–TV. The reason for that difference in marketing approach was explained by Mr. Draper, whose testimony on that point stands uncontroverted. In Mr. Draper's words, the Philadelphia market is "channel number oriented," and the Delmarva market is "call letter oriented," because the Delmarva television market is heavily penetrated by cable television, while the Philadelphia market is not. In a non-cable (*i.e.,* antenna) television environment, a broadcaster will broadcast its signal on the same channel. As a result, the broadcaster's channel number serves as a constant, stable identification source for its station. But this is not so in a cable television environment which, since 1984, has been deregulated. A cable television operator may, if it so chooses, change at will the channel on which a television station will be allowed to broadcast. WBOC–TV is a good example. In Kent County, Delaware alone, WBOC–TV appears simultaneously on three different cable channels. In its ten county total market area, WBOC appears on seven different cable channels, including Channel 16. Thus, in a cable television environment, a television station's channel number is an unstable, unconstant, and, hence, unreliable identification source. For that reason, according to Mr. Draper, it is essential that cable television broadcasters differentiate themselves from one another by the quality of their programming and by a strong emphasis on call letters, not on channel numbers.

Professor Boyd's opinion, like any expert opinion, is only as valid as the evidentiary and logical basis upon which it rests. The evidence does show that television viewers will tend to identify television stations by channel number in areas such as Philadelphia and New Castle County, Delaware, where television stations market themselves by channel number. The evidence does *not* show that viewers will identify stations by channel number in areas such as Kent County, Delaware, where stations self-promote by call letters. Logic would suggest that in those latter areas, viewers will tend to identify stations by their call letters. If that logic is wrong, no evidence has been adduced to show how or why.[8] Insofar as it purports to describe television viewer identification practices in the Delmarva market area, Professor Boyd's opinion lacks evidentiary support.

*Third,* the documentary evidence indicates that even broadcasters within the

8. Professor Boyd caused a study similar to his New Castle County survey to be conducted in Kent County, Delaware. However, because of the small size of the sample involved, Professor Boyd freely conceded that the Kent County results were not statistically valid. For that reason, the Kent County study has not been considered or given any evidentiary weight.

Philadelphia market, WBOT included, do not rely exclusively upon their channel number to promote themselves. In the Philadelphia Yellow Pages, for example, television stations are listed by call letters, followed by channel number (*e.g.,* "WPHL–TV—Channel 17"). And in its own promotional materials, WBOT–TV has promoted itself by call letter as well as channel number. In those materials "WBOT–TV" is prominently displayed, sometimes in isolation without any reference to the channel number, sometimes on an equal basis with "Channel 61," and sometimes with the call letters all capitalized, but with the channel number in smaller print.

To summarize, the evidence compels a finding that the two sets of call letters, WBOC–TV and WBOT–TV, are overwhelmingly similar from a phonetic and phonological standpoint. The defendant's argument that the similarity will not cause confusion is unsupported by the evidence.

### (ii) *Similarity of Products*

The second relevant factor is "similarity of products," which, in this case translates to the degree of similarity of the stations' broadcast programming. There are clear differences between the programming formats of WBOC–TV and WBOT–TV. WBOC is a CBS affiliate that offers the gamut of CBS programming, plus its local Delmarva Report news service. WBOT is an independent UHF station that will feature movie re-runs from the 1960's and 1970's, plus sports entertainment, including college basketball. Despite those differences, there does exist some potential for programatic competition, because CBS programming also features television movies and sports. But because the broad thrust of the stations' programming is so different, this factor must be viewed as basically neutral, favoring neither side, or as slightly favoring the defendant.

### (iii) *Area and Manner of Concurrent Use*

There is no dispute that both stations serve (or intend to serve) Kent County, Delaware. Kent County is part of WBOT's marketing area, WBOT intends to direct programming into that area, and its sales force is already at work in Kent County. The two stations are competing in Kent County for advertisements from the same source. Given the importance of Kent County to plaintiffs' overall market, the competitive threat posed by WBOT to WBOC's market in Kent County is significant. Thus, the area and manner of concurrent use of the disputed trademarks is similar. That also points to a finding that there is a likelihood of confusion as to the source of the station to which the television public is listening, whether it be WBOC–TV or WBOT–TV. *See Pathfinder Communications Corp., supra,* 593 F.Supp. at 285.

### (iv) *The Degree of Care Likely to be Exercised by Consumers*

The fourth factor, the degree of care likely to be exercised by consumers, also supports the plaintiffs' position. As found by the court in the *Pathfinder* case, 593 F.Supp. at 286, radio listeners do not pay close attention to which radio station they have chosen, because listeners have no real incentive to exercise any great care in differentiating among the symbols of the various stations. That observation is equally applicable to television station viewers, which, by and large, hail from the same group as radio station listeners. Since television viewers do not exercise a great degree of care in choosing a television station, the likelihood of confusion increases where similar marks are used for sources of broadcasts.

Decisions by the FCC, an administrative agency which over the years developed expertise in the area of call letter disputes, are consistent with this finding. Indeed, those decisions suggest that in a contested proceeding, it is highly unlikely that the FCC would have granted the call letters "WBOT" to begin with. In *The Petroleum v. Nasby Corp.,* FCC 81–361, 50 R.R.2d 34 (1981), the FCC refused to assign the call

letters "WPVN" to a Shelby, Ohio television station over the objection of station "WTVN" in Columbus, Ohio. Finding that the requested call letters involved identical and/or phonetically related letters in the same sequence, the FCC affirmed a staff determination that the requested call letters would create a "significant and unnecessary likelihood of public confusion." In *Atlantic Video Corp.*, FCC 70–856, 20 R.R.2d 610 (1970) the FCC rejected the request by a Newark, New Jersey station for the call letters "WRTV," (on Channel 68) on the ground that those letters were sufficiently similar both phonetically and rhythmically to the call letters of station "WOR–TV" (on Channel 9) in New York City, as to be a "likely cause of public confusion." The similarity between the sets of call letters involved in those FCC decisions, was no greater than the similarity of the two sets of call letters involved here.

### (v) *The Strength of WBOC's Mark*

The fifth factor, the strength of WBOC's mark, also favors the plaintiffs. It is undisputed that WBOC is an extremely strong mark in the Delmarva area, including Kent County, and that over the past 30 years WBOC–TV has expended substantial time, effort and expense to bring its mark into its market area and to imprint that mark upon television viewers. It is undisputed that the mark WBOC–TV has come to stand for a high level of quality, integrity and commitment to its viewers. "WBOC–TV" is an asset of critical significance to the plaintiffs.

### (vi) *Actual Confusion*

As previously noted, no evidence of actual confusion is required to prove a likelihood of confusion. Indeed, such evidence would normally be difficult to obtain. However, where there is evidence of actual confusion, it is probative of the likelihood of confusion. *See Pathfinder Communications Corp., supra,* 593 F.Supp. at 286–287; *Carlton's Men's Wear, Inc. v. Carl-*

*ton Hotel Stores, Inc., supra,* slip op. at pp. 3–4. In this case there is some evidence tending to show actual confusion. The receptionist at WBOC–TV's Dover office testified that after the call letters "WBOT" had been granted, she received several telephone calls where the caller asked for "WBOT" and had been given the wrong number by the telephone operator. Other WBOC employees also received telephone calls from callers who claimed to be trying to reach WBOT. The defendant vigorously contests both the admissibility of, and the weight to be accorded, such evidence. While I find such evidence to be admissible, I agree with the defendant that it does not deserve great weight. Because the callers were never identified, the defendant was foreclosed from establishing the circumstances that motivated the telephone calls. Nonetheless, taken as a whole, those telephone calls do constitute some evidence, however slight, of actual confusion, sufficient to tip this factor (again only slightly), in favor of the plaintiffs.

### (vii) *Intent of the Alleged Infringer to Palm Off Its Products As Those of Another*

As with actual confusion, proof of actual intent on WBOT–TV's part to palm off its call letters as those of WBOC–TV, is not required to prove a likelihood of confusion. Nonetheless, such intent, if shown, is a factor that will be considered probative. *Pathfinder Communications Corp., supra,* 593 F.Supp. at 287. In this case, there is no evidence that Mr. Slape and his associates initially selected the call letters "WBOT" with culpable intent. It is clear, however, that before it selected the call letters, the defendant was generally sensitive to the hazards of call letter confusion, since its concern over the similarity between "WDVI" and "WPVI" was a reason why it decided to change its call letters. Moreover, after it received permission to use the "WBOT" call letters, defendant was put on notice of WBOC's legal position, became knowledgeable of the dom-

inance of WBOC's mark in Kent County, and became aware that WBOC's mark was overwhelmingly similar to WBOT's proposed mark. Despite that knowledge, the defendant forged ahead with its plan to use the call letters "WBOT–TV." Given those circumstances, while the Court cannot conclude that the defendant has acted in bad faith, it does conclude (to paraphrase Judge Lee's finding in *Pathfinder*, 593 F.Supp. at 287), that (a) there is at least some intent on the defendant's part to trade on the good will and reputation of WBOC–TV, (b) the defendant has to be aware that it certainly would not hurt station WBOT–TV if viewers confused it with WBOC, and (c) given defendant's tight capital situation and the uncertainties facing it as a new entrant into the television marketplace, the defendant was not without economic incentive to behave in that fashion. The seventh factor, then, also favors the plaintiffs.

\*　　\*　　\*

Taken together, the foregoing factors point overwhelmingly to the conclusion that there is a likelihood that the television public will confuse the defendant's call letters "WBOT–TV" with the plaintiffs' call letters "WBOC–TV." The plaintiffs have satisfied this Court that they are entitled to prevail on the merits of both of their causes of action. Since the plaintiffs will be irreparably harmed in the absence of an injunction, and since the balance of equities favor the plaintiffs, a final injunction against the defendant's use of the call letters "WBOT–TV" will issue. Counsel are requested to confer and to submit an appropriate form of order.