| Title | Parties | Executed | Evaluation Materials | Status |
|---|---|---|---|---|
| SSA No. 1 | Cadim, PGI, PGE and PGRLP | 8/30/01 | "information regarding PGE, [PGRLP] and their subsidiaries" provided by PGE | Superseded by SSA No. 2 |
| SSA No. 2 | Cadim, PGI, PGE and PGRLP | 9/14/01 | "information regarding PGE, [PGRLP] and their subsidiaries" provided by PGE | Waived by PGE and PGRLP on 11/15/01 |
| SSA No. 3 | Cadim, PGI, PG6LP, Primestone, PGLP, PGLLC and Reschke | 8/22/02 | "information regarding Residential Newco" provided by PGI | Superseded and Amended by SSA No. 4 |
| SSA No. 4 | Cadim, PGI, PG6LP, Primestone, PGLP, PGLLC and Reschke | 8/30/01 | "information regarding Residential Newco" provided by PGI | Waived by PGI, PGRLP, Primestone. PGLP, PGLLC and Reschke on 10/10/01 |

QWEST COMMUNICATIONS INTER-
NATIONAL INC., a Delaware cor-
poration, Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,
et al., Defendants.

C.A. No. 20009.

Court of Chancery of Delaware,
New Castle County.

Submitted Dec. 9, 2002.
Decided Dec. 20, 2002.

Philip A. Rovner, Gregory A. Inskip, Matthew E. Fisher, Potter Anderson & Corroon, Wilmington, Delaware; Carolyn H. Rosenberg, Mark S. Hersh, Duane F. Sigelko, Sachnoff & Weaver, Ltd., Chicago, Illinois, for Plaintiff.

Andre G. Bouchard, Bouchard Margules & Friedlander, Wilmington, Delaware; Alfred A. D'Agostino, Jr., D'Amato & Lynch, New York, New York; Jeffrey R. Gaylord, Lewis Brisbois Bisgaard & Smith, LLP, New York, New York, for Defendants National Union Fire Insurance Co. of Pittsburgh, PA and American International Specialty Lines Insurance Co., Inc.

Richard K. Herrmann, Blank Rome Comisky & McCauley, LLP, Wilmington, Delaware; D. Wayne Jeffries, Stroock & Stroock & Lavan, LLP, Los Angeles, California, for Defendant Federal Insurance Co.

C. Scott Reese, Cooch & Taylor, Wilmington, Delaware; John Duchelle, Ross, Dickson & Bell, Washington, D.C., for Defendant Continental Casualty Company.

Joseph J. Bodnar, Walsh Monzack and Monaco, P.A., Wilmington, Delaware; John O'Connor, Peabody & Arnold, Boston, Massachusettes, for North American Specialty Insurance Company.

Michael F. Bonkowski, Saul Ewing, LLP, Wilmington, Delaware; Angelo G. Savino, Lord Bissell & Brook, New York, New York, for Gulf Insurance Co., Inc.

Frank E. Noyes, II, White & Williams, LLP, Wilmington, Delaware; Geoffrey W. Heineman, Kenneth M. Labbate, Ohren-

stein & Brown, LLP, Garden City, New York, for Zurich American Insurance Co.

C. Barr Flynn, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Joseph G. Finnerty, III, Piper Rudnick, New York, New York, for Defendant Liberty Mutual Insurance Co.

## OPINION AND FINAL ORDER

LAMB, Vice Chancellor.

### I.

The plaintiff is Qwest Communications International, Inc., a Delaware corporation ("Qwest"). Qwest brings this action to enjoin the defendants, who are a number of its insurance carriers, from circumventing insurance policy provisions that, it claims, gives Qwest the right to choose the form of alternative dispute resolution ("ADR")–mediation or arbitration–to resolve coverage disputes. Qwest claims that the carriers violated its rights under the policies when, without advance notice to Qwest, they filed a Demand for Arbitration, seeking to rescind valuable Directors and Officers and Fiduciary insurance policies that they issued to Qwest, and then refused to withdraw that demand when Qwest elected instead to mediate the dispute.

The court heard Qwest's motion for preliminary injunction on December 9, 2002, and determined to enter an injunction forthwith because Qwest had shown both a probability of success on the merits of its claims and the threat of irreparable injury. In this opinion, the court briefly explains the rationale for that decision and concludes that it is appropriate to enter final relief in favor of Qwest.

### II.

Qwest is one of the nation's largest communications companies, having its principal place of business in Denver, Colorado. Qwest is the Named Corporation on two Directors and Officers ("D & O") Liability Insurance Programs (the "Ongoing" and "Runoff" Programs), each of which consists of one primary and nine excess policies providing up to $250 million in coverage for claims (as defined in the policies) made against Qwest and its directors and officers ("Claims"). Defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") is the carrier on both primary policies, and nine excess carriers are the same on both Programs (though their order of participation differs). Six of the nine excess carriers are also defendants in this action.[1]

Qwest is also the Named Sponsor on an Employee Benefit Plan Fiduciary Liability Insurance Policy (the "Fiduciary Policy"). This primary Fiduciary Policy and three excess policies provide up to $100 million in coverage. The primary carrier is American International Specialty Lines Insurance Company ("AISLIC"). AISLIC and all three excess carriers (Federal, Gulf and CNA) are all defendants in this action.

The Ongoing, Runoff, and Fiduciary policies (collectively the "Policies") are all subject to an ADR provision that reads substantially as follows:

> ... [A]ll disputes or differences which may arise under or in connection with this policy, whether arising before or

---

1. The defendant excess carriers in the D & O Programs are Federal Insurance Company, Inc. ("Federal"), Gulf Insurance Company ("Gulf"), Continental Casualty Company ("CNA"), North American Specialty Insur-ance Company ("North American"), Zurich American Insurance Company ("Zurich"), and Liberty Mutual Insurance Company ("Liberty Mutual").

after termination of this policy, including any determination of the amount of Loss, shall be subject to the alternative dispute resolution process ("ADR") set forth in this clause.

Either the Insurer or the Insureds may elect the type of ADR discussed below; provided, however, that the Insureds shall have the right to reject the Insurer's choice of ADR at any time prior to its commencement, in which case the Insured's choice of ADR shall control.

The Policies proceed to prescribe two possible forms of ADR: (1) non-binding mediation administered by the American Arbitration Association ("AAA"), and (2) binding arbitration, also administered by the AAA.

### III.

Qwest notified the carriers of lawsuits and other Claims made against Qwest and other insureds.[2] The carriers initially responded by reserving their rights under their respective policies. Qwest thereafter regularly kept the carriers apprised of developments in the lawsuits and other Claims. In August 2002, counsel representing the plaintiffs in those suits proposed to mediate a global resolution of most of the suits pending against Qwest, its directors, officers and other insureds. Qwest was interested in pursuing this mediation (which was not governed by the terms of the Policies) and communicated its interest to its carriers. Eventually, a conference call was arranged to take place on October 10, 2002, among counsel representing Qwest and other insureds and counsel representing the carriers. The purpose of the call was to discuss the carriers' reservations of rights and to explore their willingness to contribute to any settlement that might result from the proposed global mediation.

Only two carrier representatives participated in the conference call. They informed Qwest's counsel that there were still unidentified "issues to be resolved" before the call could go forward. By agreement, the call was rescheduled for October 17, 2002. On October 11, 2002, counsel for Qwest wrote to the carrier representatives, reiterating the importance to Qwest of the proposed global mediation. While expressing its willingness to engage in a dialogue regarding the "issues" of interest to the carriers, Qwest also reminded them of the ADR provisions of the Policies. Qwest's letter stated, as follows:

> We remind you that if the insurers choose to forgo an informal dialogue and take legal action to resolve the coverage issues, the above-referenced Policies have Alternative Dispute Resolution (ADR) provisions that would apply to any coverage dispute. Under those provisions, Qwest has the right to choose the type of ADR, arbitration or mediation. Qwest expects that its insurers will comply with the terms of the Policies and respect Qwest's rights under them.

On October 17, 2002, instead of participating in the scheduled conference call, counsel for National Union sent Qwest's General Counsel a letter stating that it and the other carriers involved "had determined to rescind their respective policies" based on alleged misrepresentations in connection with their issuance. The letter also informed Qwest that certain of the carriers had filed a Demand for Arbitration with the AAA, a copy of which was enclosed. On November 14 and 15, 2002,

---

**2.** Among those Claims are two lawsuits filed in this court that have since been consolidated in one action captioned *In re Qwest Com-* *munications Inter'l, Inc. Derivative Litig.,* Cons.C.A. No. 19826.

two more carriers filed similar arbitration demands. In all, the carriers sought to rescind primary and excess policies representing $150 million of the available $250 million under the Runoff Program and $175 million of the available $250 million under the Ongoing Program.

On October 29, 2002, Qwest sent a letter to counsel for the carriers who had filed a Demand for Arbitration rejecting the carriers' choice to arbitrate the parties' disputes under the Policies and electing, instead, to mediate the disputes. Qwest also filed a Request for Mediation with the AAA and enclosed a copy of that request with its letter. Qwest asked the carriers to advise it by November 1, 2002, of their withdrawal of the Demand for Arbitration. The carriers refused to withdraw their Demand for Arbitration. Thus, on November 5, 2002, Qwest began this litigation and provided copies to the AAA and all participants in the arbitration.

The AAA scheduled an Administrative Conference Call for November 7, 2002. Qwest asked the case manager to cancel the call in light of the pendency of this action, but that request was refused since the carriers would not agree. Thereafter, Qwest notified the AAA that it would not participate in the call. That call went forward and purported to tentatively decide certain administrative matters relating to the arbitration, such as the number of arbitrators, and the location and possible duration of the hearings. In light of this development, Qwest moved for a pre-liminary injunction against the arbitration. After it filed that motion, Qwest asked the carriers to agree to a stay of the arbitration. All but one carrier agreed, but, in the absence of unanimity, the AAA refused the stay.

In response to the motion for preliminary injunction, Federal filed a motion to dismiss Qwest's complaint pursuant to Rule 12(b)(6), a counterclaim for specific performance and declaratory relief, and a motion to compel arbitration. The court heard argument on all such motions at the same time. In addition, with the consent of the parties, the court agreed to consolidate the hearing on the motion for injunction with a final hearing on the merits, in accordance with Court of Chancery Rule 65(b).

**IV.**

A preliminary injunction is extraordinary relief that may be granted only where a party demonstrates: (1) a reasonable probability of success on the merits at a final hearing; (2) that the failure to issue a preliminary injunction will result in immediate and irreparable harm; and (3) that the harm to the plaintiffs if relief is denied will outweigh the harm to the defendants if relief is granted.[3] Qwest bears the burden of establishing each of these necessary elements,[4] because injunctive relief "will never be granted unless earned."[5] Moreover, "[w]here a permanent injunction is being sought, the standards are identical, except

3. See, e.g., SI Mgmt. L.P. v. Wininger, 707 A.2d 37, 40 (Del.1998); Revlon v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 179 (Del. 1986); In re Anderson, Clayton S'holders Litig., 519 A.2d 694, 698 (Del.Ch.1986); see also In re IXC Communications, Inc. S'holders Litig., 1999 WL 1009174, at * 4 (Del.Ch. Oct.27, 1999) (stating "[t]his [preliminary injunctive] relief is extraordinary and the test is stringent").

4. See Roberts v. General Instrument Corp., 1990 WL 118356, at *7 (Del.Ch. Aug.13, 1990).

5. Lenahan v. National Computer Analysts Corp., 310 A.2d 661, 664 (Del.Ch.1973).

that actual, rather than probable success on the merits is the relevant criterion." [6]

Qwest has met its burden of showing each of these elements. The ADR provision of the Policies plainly and unambiguously gives Qwest the right to reject the defendant carriers' choice of arbitration as their preferred form of ADR. Qwest promptly exercised that right, once it received notice of the carriers' election to arbitrate. In accordance with the unmistakable meaning of the Policies, the carriers then had no choice but to dismiss their Demands for Arbitration and submit their disputes to mediation. They failed to do so and their refusal to comply with their contractual obligations threatens Qwest with the irreparable harm of having the disputes made subject to binding arbitration. Thus, Qwest has earned the requested permanent injunctive relief.

### A. Probability Of Success On The Merits

■ "The proper construction of any contract, including an insurance contract, is purely a question of law.... Clear and unambiguous language in an insurance policy should be given its ordinary meaning.... To the extent an ambiguity does exist, the doctrine of *contra preferentum* requires that the language be construed most strongly against the insurance company that drafted it." [7] To remind the reader, the language in dispute is as follows:

> Either the Insurer or the Insureds may elect the type of ADR discussed below; provided, however, that the Insureds shall have the right to reject the Insurer's choice of ADR at any time prior to

its commencement, in which case the Insured's choice of ADR shall control.

The carriers concede that this language gives Qwest a right to reject their choice of ADR, but contend that such right is limited by the phrase "at any time prior to its commencement." Because, they argue, the arbitration "commenced" when they filed their Demand for Arbitration, Qwest had no right, after that time, to reject their election. At argument, their counsel conceded that he would make the same argument if the carriers had elected mediation and immediately filed a Request for Mediation.

> THE COURT: In your view, the insurance companies could always trump [Qwest's] right to reject their choice of ADR simply by communicating their choice at the same time that they communicated [that] they had filed a demand for either mediation or arbitration, isn't that true?

> Mr. Jeffries: Yes, that's correct.

■ "Contracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless.'" [8] The carriers' reading of the policy language, if credited, would read Qwest's right to reject the carriers' choice of ADR–and to have its rejection control–straight out of the contract. So long as a carrier was crafty enough to couple its ADR "election" with the filing of a piece of paper formally initiating the ADR process, Qwest would have no choice but to agree to that form of ADR. This court will not countenance such a nonsensical and unfair reading of the contract.

**6.** *Draper Communications, Inc. v. Delaware Valley Broadcasters, L.P.,* 505 A.2d 1283 (Del. Ch.1985).

**7.** *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Insurance Co.,* 616 A.2d

1192 (Del.1992); *see also Kaiser Alum. Corp. v. Matheson,* 681 A.2d 392, 398–99 (Del.1996)

**8.** *O'Brien v. Progressive Northern Ins. Co.,* 785 A.2d 281, 287 (Del.2001).

The only sensible and fair way to construe the policy language at issue is to read it as requiring that, if the carriers make an election about the type of ADR, they must communicate that election to Qwest in a way that affords Qwest a reasonable opportunity to reject the carriers' choice. The carriers' only objection to this construction is premised on their overzealous reading of the phrase "prior to its commencement" as encompassing the mere filing of a piece of paper initiating the arbitration or mediation process. Viewing the contract language as a whole, the court strongly disagrees that the carriers have the ability to usurp Qwest's right of rejection by simply filing a piece of paper with the AAA. While it is not necessary, in this case, for the court to decide what constitutes the "commencement" of an arbitration or mediation within the meaning of the Policies, it is clear that something more substantial than happened here is needed.[9] In this case, at the time Qwest communicated its rejection of the carriers' election to arbitrate, nothing of any substance had occurred in that proceeding. Only if Qwest, with due notice of the carriers' choice, delayed exercising its right of rejection until the parties had actually begun arbitrating in some substantial sense (such as actually conducting hearings with the arbitrators) would the language at issue support the position advanced by the carriers in this case.[10]

### B. Irreparable Harm

There is no question that Qwest will suffer irreparable injury if the defendants continue to pursue their Demand for Arbitration, as Qwest will lose an important contract right affecting a high stakes insurance coverage dispute. Under the Policies, arbitration is binding but mediation is not and the parties have the right to pursue litigation if the mediation is not successful. If the arbitration proceeds, Qwest will face the Hobson's choice of participating in order to avoid the possibility of being bound by an adverse outcome or exercising its contractual right to reject arbitration as the method of ADR for this dispute. For this reason, a loss of the right to designate mediation as the method of ADR threatens Qwest with irreparable harm.[11]

The court recognizes that, ordinarily, a declaration of rights in a proceeding such as this is sufficient to cause the losing parties to conform their future conduct to the court's decree. Nevertheless, because the AAA arbitrators may have independent duties to process the Demands for Arbitration, the court concludes that it is appropriate to enter an order directing the defendants to dismiss their Demand for Arbitration.

### V.

For these reasons, the court concludes that Qwest properly exercised its right under the Policies to reject the defendant insurance carriers' choice of arbitration as the method of ADR for resolving the existing coverage disputes. Therefore, the defendants are directed, forthwith, to

---

9. The court notes that the rules of the AAA do not define the "commencement" of an arbitration or mediation. Instead, Rules R–4 and R–5 of the AAA Commercial Arbitration Rules prescribe the method for "initiation" of an arbitration.

10. In view of its conclusion that the contract is unambiguous, the court will not address the other arguments advanced by Qwest in support of its position.

11. See, e.g., Solar Cells, Inc. v. True North Partners, L.L.C., 2002 WL 749163, at *7, 2002 Del.Ch. LEXIS 38 (Del.Ch.), at *25 (Apr. 25, 2002).

withdraw or dismiss their Demands for Arbitration and to submit themselves to mediation pursuant to the Request for Mediation filed by Qwest. IT IS SO ORDERED.