# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STONEBRIDGE TOWNHOMES OWNERS' ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) | C.A. No. 2020-0607-SEM |
| MARK T. PTOMEY and MARTHA PTOMEY, | ) ) ) ) | |
| Defendants. | ) ) | |

Final Report: February 27, 2026
Date Submitted: November 13, 2025

## FINAL POST-TRIAL REPORT

Chad J. Toms, Queen C. Nwangwu, WHITEFORD, TAYLOR & PRESTON, LLC, Wilmington, Delaware; *Counsel for Plaintiff Stonebridge Property Owners' Association, Inc.*

Mark T. Ptomey, Martha K. Ptomey, Wilmington Delaware; *Self-Represented Defendants.*

**MOLINA, Senior Magistrate**

This homeowners' association dispute began more than five years ago with the association's complaint alleging homeowners were trespassing on the community's common areas. The homeowners do not dispute that they are exclusively using and enjoying the area at issue. But they argue that they have acquired title to the area through adverse possession. That adverse possession counterclaim was the focus of our trial last fall. Through this post-trial decision, I conclude the homeowners failed to meet their burden of proof and judgment should be entered for the association on its trespass claim. The contested area should be cleared out, returned to the association, and remediated at the homeowners' expense. The association should recover costs as the prevailing party, but attorneys' fees should not be shifted.

This is my final report.

## I. BACKGROUND[1]

This action was initiated by Stonebridge Townhome Owners' Association (the "Plaintiff") against homeowners Mark T. Ptomey and Martha K. Ptomey (the "Defendants"). The Plaintiff is a non-profit Delaware corporation, which is responsible for the maintenance of the private open space of the development known

---

[1] The facts in this report reflect my findings based on the record developed at trial on October 15, 2025. *See* Docket Items ("D.I.") 163. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcript are in the form "[Last Name] Tr." referring to the testimony of the identified person; I use full names to differentiate the defendants. The plaintiff's exhibits are cited as "PX__," and the defendants' as "DX__."

as Stonebridge, a community of townhomes in New Castle, Delaware.[2] The Defendants own a townhome in Stonebridge located on 457 Stonebridge Blvd. (the "Unit"). The Unit is adjacent to land which is denoted as private open space owned and controlled by Stonebridge (the "Common Area"). It is the Defendants' (primarily Mr. Ptomey's) use of that Common Area that is in dispute. I will begin with a factual background, before turning to the dispute before me.

A.     **Stonebridge**

The Stonebridge community dates back, at least, to 1989. The original plan was for condominiums.[3] In November 1989, Mann-Talley Engineers & Surveyors recorded a re-subdivision plan for Stonebridge, presumably to that effect.[4] That plan was then superseded by a 1990 plan submitted by Stonebridge Townhomes, Inc. for a community of townhomes.[5] In that 1990 plan, the developer confirmed that the subdivision would include "open space" which would be maintained privately and available for public use.[6]  The Plaintiff was incorporated in 1990 to manage and maintain that space.[7]

---

[2] PX8(B).

[3] *See* Weinsteiger Tr. 95:11-14.

[4] *See* PX7.

[5] *Id.*

[6] *Id.*

[7] PX8(C) at 43–44.

Properties within Stonebridge are governed by a set of documents, including Stonebridge's Declaration of Restrictions and supplements thereto (collectively referred to as the "Declaration"),[8] and the Stonebridge Townhomes Owner's (*sic*) Association Rules and Regulations (the "Regulations").[9]

The Declaration provides, in relevant part, that owners of units within Stonebridge shall have "the free and uninterrupted use of all of the . . . private and/or public open space, as shown on the Plans, in common with others entitled thereto forever."[10] It further provides that each owner, "by acceptance of the deed, grants to all other such owners, . . . the free and uninterrupted use of all the . . . private and/or public opens spaces, and grants to the maintenance corporation the right to come upon any owner's property for purposes of maintaining the . . . private and/or public open spaces."[11] There is no dispute that the Common Area is a covered "open space."[12]

The Regulations govern how homeowners within the community can seek alterations to community property. Specifically, Section E provides that

---

[8] PX8(A)–(D).

[9] PX8(E).

[10] PX8(C) at 45–46.

[11] *Id.*

[12] *See* PX7; D.I. 5 ¶ 10.

3

homeowners must seek "prior consent of the Board[.]"[13]  Owners are also prohibited from installing fences or engaging in "noxious or offensive activity."[14]

## B.    The Unit

Although, at first glance, the Defendants appear to be newcomers to the community, the Unit is their family property. It was originally owned by Ms. Ptomey's sister and Mr. Ptomey's aunt: Mary Elizabeth "Beth" Kuhn. Ms. Kuhn purchased the Unit directly from the builders of the Stonebridge community on September 30, 1992.[15] Neighbors described Ms. Kuhn as a "nice" person and an overall "great" neighbor.[16]

The Defendants' disputed use of the Common Area stems from Ms. Kuhn's historical use. She first altered and maintained the area to address drainage issues that she faced when she moved into her home in 1992.[17] "[D]uring heavy rains, she

---

[13] PX8(E) ¶ E(1). The board must then respond to written requests within 45 days. PX8(E) ¶ E(2).

[14] PX8(E) ¶ E(8); PX8(E) ¶ F(9).

[15] PX5. *See also* Mackes Tr. 32:3–6.

[16] Weinsteiger Tr. 94:17–20; Mackes Tr. 74:12. Robert Mackes, owner of Unit 465 since 2008, and Ms. Kuhn's neighbor for approximately seven years, described her as being "very personal" and keeping "her property meticulously maintained." Mackes Tr. 15:19–16:4, 74:12–14. Mr. Mackes' property is located on the opposite corner of the same building as the Unit. Mackes Tr. 21:4–7. Ann Weinsteiger, also Ms. Kuhn's neighbor for several years and owner of Unit 457, described Ms. Kuhn as being "very nice" and "down-to-earth." Weinsteiger Tr. 94:17–223. From her property, she can view the Common Area. Weinsteiger Tr. 94:3–14.

[17] *See* Mackes Tr. 22:10–24; *see also* Weinsteiger Tr. 98:5–21.

4

would get water in her house. And so[,] by agreement with the builder and then subsequently the board of directors, she was given permission to maintain a swale[18] that directed the water away from the common area."[19] Ms. Kuhn also had permission to maintain a garden, shed, and fence within the Common Area.[20]

Ms. Kuhn was granted this special permission to use and enjoy the Common Area despite the restrictions in the Declaration.[21] When Ann Weinsteiger first became a board member in 2011, she asked about Ms. Kuhn's shed and fencing in the Common Area, and was told by prior board members that: "it had been grandfathered because they had been building [Stonebridge] as condominiums. . . [a]nd then when it became townhomes and they were not going to allow that type of shed and fencing in common areas, they . . . allow[ed] [Ms. Kuhn's fencing] there."[22]

---

[18] A "swale" is a "low-lying or depressed and often wet stretch of land." MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/swale (last updated Sep. 24, 2025).

[19] *See* PX10(A); Mackes Tr. 22:16–21, 26:7–11; Weinsteiger Tr. 103:16–20. The Defendants' trial testimony disputing any such permission was not persuasive and was overborne by the evidence to the contrary including Ms. Ptomey's own deposition testimony. *See* Martha Ptomey Tr. 313:16–316:8.

[20] *See* PX20 (Martha Ptomey Dep.) 5:23–6:3 (stating that the shed went in shortly after Ms. Kuhn purchased the Unit). Mr. Mackes testified that Ms. Kuhn had a small garden, which contained "some tomato plants, vegetable plants, basil, herbs, things like that, [and] some flowers." Mackes Tr. 23:16–18. Mr. Mackes also testified that community members had open access to Ms. Kuhn's garden, something Mr. Ptomey disputes. *Compare* Mackes Tr. 23:21–24 *with* Mark Ptomey Tr. 260:23–261:4.

[21] *See* Mackes Tr. 23:7–9.

[22] Weinsteiger Tr. 95:3–12.

Mr. Ptomey was not privy to any permission granted but was a frequent visitor to his aunt's property. He helped Ms. Kuhn work on the property starting when he was around eight or nine years old.[23] Ms. Ptomey was also privy to Ms. Kuhn's gardening activities.[24] It appears they both enjoyed a close relationship with Ms. Kuhn until her passing in February 2015.

## C. The Ptomeys

Shortly after Ms. Kuhn's passing, Mr. Ptomey moved into the Unit.[25] He was, initially, a tenant, until he and his mother, Ms. Ptomey, officially purchased the Unit on March 31, 2017.[26]

This change of ownership triggered a few things. On the Plaintiff's side, it compelled Ms. Weinsteiger, acting on behalf of the Plaintiff, to direct the community's property manager that, with the transfer, "the shed should be removed, unless [Stonebridge's] architectural guidelines change before then."[27] The Plaintiff, thus, anticipated that the new owners would have reduced use and possession of the Common Area.

---

[23] Mark Ptomey Tr. 207:23–208:3; PX19 ("Mark Ptomey Dep.") 29: 4–8. *See also* Mackes Tr. 56:13–21.

[24] Martha Ptomey Tr. 292:14–20.

[25] Mark Ptomey Tr. 241:14–19.

[26] PX6. The parties dispute whether Mr. Ptomey had, and disclosed to the Plaintiff, a rental agreement for his initial residence; that factual issue is not material to the dispute presently before me.

[27] PX10(A).

Mr. Ptomey had other plans. Shortly after the Defendants took title to the property, Mr. Ptomey started to make modifications to the Common Area. The Defendants first expanded the original fencing and then the patio. Mr. Ptomey testified that he "replaced" the fencing because the original fencing was twenty years old at the time and was "bent over with vegetation or with animals trying to go over it [or] under it."[28] But the Defendants also significantly expanded the size, material, and perimeter of the fencing.[29]

The Defendants also removed the central garden and expanded the size of the original patio underneath. Mr. Ptomey testified that he removed Ms. Kuhn's central garden because his large dogs destroyed it by constantly running through it.[30] When he took out the central garden, he found a "crumbling patio" beneath it.[31] He, thus,

---

[28] Mark Ptomey Tr. 247:8–12.

[29] *See, e.g.*, PX13 (showing an enclosed fence with a topper made of black tarp). This expansion was confirmed by the Defendants' evidence, in particular the Google Earth images in DX1. The Plaintiff objected to DX1 for lack of authentication. Tr. 203:21–204:10. That objection is overruled and DX1 is admitted into evidence. Under Delaware Rule of Evidence 901, authentication requires the proponent to produce evidence sufficient to support a finding that the item is what the proponent claims it is. One way to do that is through testimony of a witness with knowledge—*i.e.*, testimony that an item is what it is claimed to be. D.R.E. 901(b)(1). At trial, Mr. Ptomey and Ms. Ptomey testified to their intimate familiarity with the Unit, the changes done over the years, and that those changes were accurately reflected through the pictures in DX1. *See, e.g.*, Mark Ptomey Tr. 206:2–215:23. That testimony is sufficient to show that the images are what Mr. Ptomey claims them to be—changes to the Unit and Common Area from 1992 to present.

[30] Mark Ptomey Tr. 242:12–17. *See also* Mark Ptomey Dep. 13:16–18 ("[the garden] got removed when I got there because my dogs just were killing everything in it as soon as they ran out the door."); DX1.

[31] Mark Ptomey Tr. 243:6–7.

hired a contractor to bring the "crumbling" patio up to the level of the original patio.[32] Mr. Ptomey testified that he was not "enlarging" the patio but "merely repair[ing] the concrete that existed."[33] But, in his August 22, 2022 deposition he admitted to extending the surface area.[34] He explained that once the original center garden was removed, the "crumbling patio" was "probably about ten inches below the existing pad, so [he] had [concrete] poured on to top to make it so it was [an] even transition from the other pad instead of having a step down."[35]

This work was not well taken. Acting on behalf of the Plaintiff, Ms. Weinsteiger put a note on the Defendants' front door informing them that they needed to stop their work and reach out to the managing company.[36] She also sent an email to the managing company on May 29, 2018, making them aware of the

---

[32] *Id.* at 243:7–14.

[33] *Id.* at 243:14–16.

[34] Mark Ptomey Dep. 13:10–12.

[35] *Id.* at 13:18–14:3.

Mr. Ptomey was doing more than expanding the footprint for personal enjoyment; he began operating an animal rescue in the Unit and into the Common Area in or around 2023. *See* Mark Ptomey Tr. 245:13–14. Whether those commercial activities were a separate violation of the restrictions on the Unit was an issue in this action until the second pretrial conference as addressed below. The commercial activities will not be addressed in this report. I will also not attempt to summarize or opine on the criminal proceedings that appear to be ongoing regarding the animal rescue and removal of said animals from the Unit. *See* D.I. 147. Those matters are outside the scope of the issues ripe for my consideration.

[36] Weinsteiger Tr. 113:13–19. This was after prior disputes about the Defendants having a commercial vehicle parked outside the Unit. *See* PX10(B)–(C); Weinsteiger Tr. 111:1–112:17.

8

activity being done on the Common Area, noting it required the Plaintiff's approval.[37] The Plaintiff then sent a letter to the Defendants on May 31, 2018, informing them that "[a]ll construction must cease until the proper approval has been granted by the Association, or legal action would be taken."[38] That letter went unclaimed and was returned to sender.[39] The Plaintiff sent a follow-up email to the managing company on June 30, 2018, asking that they contact an attorney and characterizing the situation as "urgent."[40]

The Defendants engaged with the property manager and acted, to some extent, upon these communications.[41] Through an application dated July 17, 2018, the Defendants first sought approval for the work "presently done" to the property.[42] The retroactive request was formally denied by letter dated October 19, 2018.[43] The Defendants then made another request on May 20, 2019, again for "work presently

---

[37] PX10(D).

[38] PX10(E).

[39] *Id.*; *see also* Weinsteiger Tr. 114:12–115:14.

[40] PX10(F).

[41] *See* Mark Ptomey Tr. 246:8–21.

[42] PX10(G).

[43] PX10(H).

done."[44] The Plaintiff did not respond to the reiterated request in writing;[45] rather, it hired legal counsel to take over the dispute.[46]

Through counsel, the Plaintiff, on August 13, 2029, alerted the Defendants to their trespass and requested to schedule a meeting.[47] The Plaintiff's request was repeated on August 27, 2019.[48] The Defendants never responded to these requests and a third request was made by the Plaintiff on September 15, 2019, this time warning that the Plaintiff would seek legal action if they received no response.[49] The Defendants continued to be unresponsive, and the Plaintiff sent a final cease and desist letter dated September 28, 2019.[50]

### D. Procedural Posture

With the Defendants unresponsive and continuing to use the Common Area, the Plaintiff ultimately initiated this action on July 22, 2020.[51] Seeing a largely

---

[44] PX10(I).

[45] *See* PX8(E) ¶ E(2). Ms. Weinsteiger testified that a rejection was orally communicated to the Defendants through the property manager. Weinsteiger Tr. 136:11–14.

[46] Per Mr. Ptomey, the Defendants reached a potential easement agreement with the property manager, but it was overruled by Mr. Weinsteiger. Tr. 246:14–20.

[47] PX10(J).

[48] PX10(K).

[49] PX10(L).

[50] PX10(M).

[51] D.I. 1. While this action was pending, the Defendants continued to alter and use the Common Area. *See, e.g.*, PX1, PX13. This continued use was described by multiple witnesses, including Sharita Brooks, a code officer for New Castle County. Officer Brooks testified about her involvement with the Unit and the Defendants, in connection with

inactive docket, I wrote to the parties on August 17, 2021 asking about the status of this action. In response, the Plaintiff's counsel advised on August 23, 2021 "that the parties [had] reached a framework for the resolution of this matter."[52] They hoped to file a stipulation within 30 days. By November, however, the parties reported "a few points of contention[,]" which were holding up the stipulation.[53] But, in February 2022, counsel reported that the parties were "unsuccessful in reaching an amicable resolution of the matter."[54]

With settlement off the table, litigation truly began in 2022. The parties initially tried to resolve this action through motions for summary judgment. The Plaintiff filed its first motion for summary judgment on March 18, 2022.[55] I denied that motion without prejudice on July 14, 2022 finding the evidentiary record wanting, yet with material disputes of fact.[56] Thereafter, I entered a schedule for fact

---

complaints made to the county. Brooks Tr. 177:1–179:18. Those complaints led to several inspections of the property, a search warrant, and a determination that the Unit was not livable. *See* Brooks Tr. 178:2–15, 188:18, 190:7–11. New Castle County's investigation and findings are outside the limited scope of these proceedings.

[52] D.I. 9.

[53] D.I. 10.

[54] D.I. 13.

[55] D.I. 17.

[56] D.I. 28.

discovery to conclude by February 2023, with another opportunity for dispositive motion practice thereafter.[57]

The Plaintiff filed their second motion for summary judgment on January 11, 2023,[58] and the Defendants cross-moved on March 16, 2023.[59] Around this time, the case was reassigned to newly appointed Magistrate Judge Mitchell.[60] Magistrate Judge Mitchell heard the second motion for summary judgment and denied it through an order dated November 6, 2023, explaining there were still genuine disputes as to material facts, particularly regarding the Defendants' adverse possession counterclaim.[61] Magistrate Judge Mitchell then set a new schedule, expanding the fact discovery timeline and permitting another dispositive motion opportunity in advance of a June 2024 trial date.[62]

Under this new schedule, the Defendants moved again for summary judgment on March 21, 2024.[63] The Plaintiff opposed the motion but, shortly thereafter, changed counsel.[64] With that change of counsel, the Plaintiff requested a

---

[57] D.I. 30.

[58] D.I. 33.

[59] D.I. 37.

[60] D.I. 32.

[61] D.I. 55.

[62] D.I. 57.

[63] D.I. 58.

[64] D.I. 65, 68.

continuance of the June 2024 trial date, with an opportunity for more discovery and another dispositive motion opportunity.[65] At a June 4, 2024 teleconference, Magistrate Judge Mitchell denied the latest motion for summary judgment, and granted the continuance in part, directing the parties to secure a new trial date in Fall 2024, and denying the Plaintiff's request to reopen discovery or file another motion for summary judgment.[66] The parties ultimately landed on October 2, 2024 for their new trial date.[67]

Shortly thereafter, I was reassigned to this matter.[68] Thereafter, the Defendants tried again to secure summary judgment; I denied their motion on September 24, 2024.[69] Mr. Ptomey then requested a continuance of the October 2, 2024 trial for health reasons, which I granted by minute order.[70]

In connection with that continuance, the Plaintiff sought a status quo order.[71] I heard that request during a teleconference on October 2, 2024, and granted it, in part, barring the Defendants, "and anyone acting on their behalf, [from making] any

---

[65] D.I. 67.

[66] *See* D.I. 73–75.

[67] *See* D.I. 78.

[68] D.I. 79.

[69] D.I. 87–88.

[70] D.I. 91.

[71] *See* D.I. 90–92.

modifications, improvements, alterations, or changes to the" Common Area (the "Status Quo Order").[72]

By April 2025, the Plaintiff contends the Defendants were violating the Status Quo Order.[73] The Plaintiff moved for contempt and sanctions (the "Contempt Motion").[74] The Defendants denied any contemptuous behavior, cross-moved arguing the Plaintiff was the bad actor, and requested more time to prepare for trial, advocating for a further 6-month continuance.[75] I heard and denied those requests at a June 16, 2025 telephonic hearing; the Contempt Motion, I ruled, would be

---

[72] D.I. 93. Before the Status Quo Order, the Defendants had continued to modify, alter, and expand their contested use. The most current showing of their use was demonstrated during trial by drone footage obtained by the Plaintiff. PX2. During trial, the Defendants objected to the admissibility of the drone footage. *See* Defendants Tr. 59:24–60:7. I directed the Plaintiff to submit the flight approval plan and held in abeyance my ruling on admissibility until I could review the plan and applicable Delaware law. Tr. 63:16–21. On November 5, 2025, the Plaintiff submitted: (1) a scope of work that depicts the agreement between the Plaintiff and its vendor; (2) a copy of the drone pilot's license by the Federal Aviation Administration (the "FAA"); and (3) a copy of the FAA's approval, obtained by an online application. D.I. 161. This submission resolves any concerns and PX2 is admitted. *Cf.* 11 *Del. C.* § 1334 (criminalizing, at the state level, certain drone operation, but exempting any use for "a commercial or other purpose if the operator is authorized by the Federal Aviation Administration"); BETHANY BEACH, DE., CODE pt. III, ch. 212, art. III, § 212-6(b) (2016) (prohibiting drone operators in the Town of Bethany Beath from flying their drone: "[d]irectly over any person who is not involved in the operation of the [drone], without such person's consent; [and] "[o]ver property that the operator does not own, without the property owner's consent, and subject to any restrictions that the property owner may place on such operation"). The operator was authorized, the flight was over the Common Area at the behest of the Plaintiff, and the Defendants have failed to articulate any wrongful conduct in connection therewith.

[73] *See* D.I. 95.

[74] *Id.*

[75] D.I. 97–102.

addressed post-trial and the parties were to secure a trial date in or around September 2025.[76]

Ultimately, I scheduled a pretrial conference for September 10, 2025, before an October 15, 2025 trial date.[77] The Defendants failed to appear at the initial pretrial conference despite notice and opportunity to do so.[78] In their absence, I granted the Plaintiff's two evidentiary requests and confirmed those rulings by letter issued the same day as the conference.[79]

I scheduled another pretrial conference for September 29, 2025, which went forward with all parties present.[80] At the second pretrial conference, Mr. Ptomey stipulated that his "business will not operate on [the contested] property."[81] I instructed the parties to work together to memorialize that limiting stipulation in writing, but they were unable to do so and Mr. Ptomey later attempted to qualify or limit his representation. I held Mr. Ptomey to it, nonetheless, as explained in my October 7, 2025 ruling denying Mr. Ptomey's emergency motion for a temporary restraining order and preliminary injunction.[82] At the second pretrial conference I

---

[76] *See* D.I. 113–116.

[77] D.I. 118.

[78] D.I. 121–122.

[79] D.I. 122.

[80] D.I. 131.

[81] D.I. 154 (Pretrial Tr.) at 30:13–14.

[82] D.I. 147.

15

also limited the Defendants' trial presentations to account for their failure to timely disclose exhibits and witness lists.[83]

The rescheduled trial went forward as planned on October 15, 2025.[84] The parties completed their evidence but needed additional time for closing remarks; I directed them to submit written closing statements on October 22, 2025, which they did timely.[85] The final outstanding matter related to drone footage played at trial, but for which the Defendants preserved an objection; the Plaintiff produced the documentation I ordered on November 5, 2025.[86] With the Defendants' letter response thereto, filed on November 10, 2025, I took this matter under advisement.[87]

## II. ANALYSIS

Although initiated as a trespass action, the primary question before me is whether the Defendants have adversely possessed the Common Area. If the answer is "yes," they are the rightful owners and cannot be held liable for the alleged trespass. If "no," they have trespassed, and the Plaintiff is entitled to judgment in its favor and appropriate relief. For the reasons explained herein, I conclude the

---

[83] D.I. 131.

[84] D.I. 155. Before trial, Mr. Ptomey filed two purportedly emergency motions related to animals at the Unit, which I denied on October 7, 2025. D.I. 141–48.

[85] D.I. 156; D.I. 158.

[86] D.I. 161.

[87] D.I. 162.

Defendants have failed to meet their burden to prove adverse possession and I award injunctive and monetary relief for their trespass.

The Plaintiff's remaining requests for relief are largely denied. The Plaintiff failed to prove violations of the Status Quo Order sufficient to find contempt; the Contempt Motion, as preserved, is therefore denied. And the Plaintiff has failed to convince me that I should shift its attorneys' fees to the Defendants. I do, however, recommend that costs be shifted in the Plaintiff's favor as the prevailing party.

I address these matters in turn.

### A. The Defendants did not prove adverse possession.

The Defendants' trespass onto the Common Area in this matter is uncontested; the Defendants have admitted on numerous occasions that they are using the Common Area as their own.[88] But the Defendants contend that they own the property through adverse possession.[89] To prevail on their counterclaim of adverse

---

[88] *See, e.g.*, D.I. 5 ¶ 12.

[89] The Defendants also appear to argue that the Plaintiff consented to their actions by failing to respond to their May 20, 2019 request. *See* Weinsteiger Tr. 136:7–14; D.I. 156 at V.2 ("silence in the face of obvious possession is consent by acquiescence"). The Defendants rely on paragraph E(2) of the Regulations, which states '[t]he Board shall have the obligation to answer any written request received by it from a Unit Owner for approval of a proposed structural addition, alteration or improvement to his or her Unit within forty-five (45) days after receipt of such request, and failure to do so within the stipulated time shall constitute a consent to the proposal." PX8(E) ¶ E(2). In doing so, however, the Defendants ignore the preceding language, which states "[n]o Unit Owner (or tenant) may make any structural additions, alterations or improvements in his or her unit or in or to the association areas, without the *prior* consent of the Board[.]" PX8(E) ¶ E(1) (emphasis

17

possession, the Defendants needed to "show by a preponderance of the evidence that [they] used and possessed the [Common Area], in a manner open and notorious, exclusive, and hostile and adverse, for a continuous statutorily-prescribed period of years. The prescriptive period in Delaware is twenty years."[90]

"Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[91] If this burden is met, the record holder may overcome it with sufficient proof that the use or possession was permissive.[92]

The Defendants' evidence falls short. The Defendants have demonstrated that they possessed the Common Area openly and notoriously. But the record shows that the initial possession was permissive and the expanded possession, although adverse and hostile, was not for the statutorily required period (20 years).

---

added). Reading these provisions together, it would not be appropriate to treat the lack of written response as consent. The Defendants' argument fails.

[90] *Swann Keys Civic Ass'n v. Dippolito*, 2022 WL 17999590, at *6 (Del. Ch. Dec. 30, 2022), *aff'd*, 340 A.3d 1133 (Del. 2025) (citations omitted).

[91] *St. of R.I. Off. of Gen. Treasurer on Behalf of Empls.'Ret. Sys. Of R.I. v. Paramount Glob.*, 331 A.3d 179, 190 (Del. Ch. 2025) (citing *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010)) (internal quotation marks omitted).

[92] *Est. of Waples v. Burton*, 2020 WL 3286535, at *2 (Del. Ch. June 18, 2018) (citing *In re Campher*, 1985 WL 21134, at *2 (Del. Ch. Mar. 20, 1985)).

To reach the 20-year period, the Defendants point back to Ms. Kuhn, who used parts of the Common Area for her flower beds, shed, and fencing. Only with her use included can they reach the 20-year mark. But the evidence at trial demonstrated that Ms. Kuhn's use was permissive, not adverse or hostile. And, even if her use could be seen as adverse or hostile, the Defendants greatly expanded the footprint thereof, cutting off the tracking period and defeating their claim now.

"A use is adverse or hostile if it is inconsistent with the rights of the owner."[93] Stated otherwise, "[h]ostile means against the claim of ownership of all others, including the record owner."[94] "It is not necessary that one entering a property must expressly declare his intention to take and hold the property as his own. The actual entry upon and the use of the premises as if it were his own, to the exclusion of all others, is sufficient."[95] The adverse possessor must prove that the use was adverse to the rights of the record holder.[96]

The trial record confirmed that Ms. Kuhn had permission for her use of the Common Area. The only evidence to the contrary was the testimony of the Defendants. Mr. Ptomey's testimony was unpersuasive as largely self-serving and

---

[93] *Berger v. Colonial Parking, Inc.*, 1993 WL 208761, at *4 (Del. Ch. June 9, 1993).

[94] *Bogia v. Kleiner*, 2019 WL 3761647, at *10 (Del. Ch. Aug. 8, 2019).

[95] *Tumulty v. Schreppler*, 132 A.3d 4, 27 (Del. Ch. 2015).

[96] *David v. Steller*, 269 A.2d 203, 204 (Del. 1970).

admittedly lacking foundation.[97] Ms. Ptomey's testimony was even less persuasive because it was undermined by her deposition testimony.[98] The Defendants' evidence failed to prove that, more likely than not, Ms. Kuhn's use was adverse and hostile, rather than permissive.[99] Because Ms. Kuhn's possession of the Common Area was permissive, the Defendants cannot tack the 22 years Ms. Kuhn was in possession of the Common Area to the three years they were in possession when this case was initiated; therefore, they fail to meet the 20-year requirement.

### B. The Common Area should be cleared out and returned to the Plaintiff and remediated at the Defendants' expense.

Absent adverse possession, there is no dispute that the Defendants are trespassing.[100] The only question that remains is the relief warranted to address their trespass. The Plaintiff seeks mandatory injunctive relief and damages. For the

---

[97] Mark Ptomey Tr. 255:16–256:24 (admitting that he never had a discussion with Ms. Kuhn about whether she had or did not have permission to utilize the Common Area).

[98] *See* Martha Ptomey Dep. 5:23–6:3 ("Berman who owned the property let her, you know, put grass and stuff down, you know, when they were done and I don't know who have her permission for the shed, but the shed went right in in October."); *Id.* at 4:12–14 ("Nobody ever knocked on [Ms. Kuhn's] door. Matter of fact neighbors came over to borrow—I mean to cut her herbs and go through her garden[.]").

[99] *Cf.* Weinsteiger Tr. 121:1–5 (stating that it was her "understanding that Ms. Kuhn had permission to maintain the garden and her shed on [the] property."); Mackes Tr. 23:21–24 (explaining that members of the community had "open access" to help themselves to herbs and plants in the garden.).

[100] The Defendants asserted the affirmative defenses of laches and equitable estoppel in their answer and briefly mentioned them in their closing statement. *See* D.I. 5; D.I. 156. But the Defendants failed to meet their burden of proof by failing to produce any evidence during trial supporting either of their defenses.

former, it seeks an injunction requiring the Defendants to remove any property on, or improvements to, the Common Area and a prohibition against their use or possession thereof going forward.[101] For the latter, it seeks damages for any costs it incurs remediating the Common Area to remove the unauthorized alterations thereto. I grant both forms of relief.

For its request for injunctive relief, the Plaintiff needed to prove "(1) actual success on the merits; (2) irreparable harm; and (3) the harm resulting from failure to issue an injunction outweighs the harm befalling the opposing party if the injunction is issued."[102] On the damages side, this Court has looked to and adopted the Restatement (Second) of Torts under which "the reasonable cost of replacing the land in its original position is ordinarily allowable as the measure of recovery."[103]

---

[101] The Plaintiff initially sought further injunctive relief barring the Defendants from operating a business at the Unit. D.I. 126. This request was reiterated in the Plaintiff's closing statement. D.I. 158. As noted, however, this issue was mooted by Mr. Ptomey's binding representation at the second pretrial conference. D.I. 131. I confirm herein Mr. Ptomey's binding representation that his rescue business will no longer operate at the Unit, subject to the limited exceptions agreed to by the parties at the pretrial conference. *See* D.I. 147.

[102] *ID Biomed. Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995) (citing *Draper Commc'ns, Inc. v. Del. Valley Broads., L.P.*, 505 A.2d 1285, 1288 (Del. Ch. 1985)).

[103] *Gordon v. Nat'l R.R. Passenger Corp.*, 1997 WL 298320, at *9 (Del. Ch. Mar. 19, 1997) (quoting RESTATEMENT (SECOND) OF TORTS § 929 cmt. b (1979)).

Here, the Plaintiff met its burden of proof on both injunctive relief and damages. The Defendants' continuing trespass onto the Common Area amounts to irreparable harm. The Defendants are exclusively possessing the Plaintiff's private land without their permission and excluding other members of the community from free and uninterrupted use of the Common Area; injunctive relief to have the Defendants' items removed and the Common Area returned to the Plaintiff is warranted.

The Plaintiff also suffered damages directly caused by the Defendants' trespass. Here, the Plaintiff is seeking damages sufficient to compensate it for restoring the land to its natural condition. The amount is presently unknown, because of the Plaintiff's exclusive and hostile possession. The Common Area should be returned to the Plaintiff, which can remediate the unauthorized modifications thereto and assess the reasonable cost thereof to the Defendants.

**C. The Plaintiff has not demonstrated that the Defendants should be sanctioned for violating the Status Quo Order.**

Through the Contempt Motion, which was held for post-trial consideration, the Plaintiff further argues that the Defendants violated the Status Quo Order and should be sanctioned accordingly.

To prove contempt, the Plaintiff needed to demonstrate that the Defendants were "bound by an order, ha[d] notice of it, and nevertheless violate[d] it."[104] The violation "must not be a mere technical one, but must constitute a failure to obey the Court in a meaningful way."[105] The Plaintiff, as "party petitioning for a finding of contempt[, bore] the burden to show contempt by clear and convincing evidence."[106]

The Plaintiff failed to meet this burden. The Plaintiff contends that the Defendants continued to alter the Common Area despite my prohibition in the Status Quo Order. But the Plaintiff failed to present convincing evidence that material alterations were made after I issued the Status Quo Order; the changes and timeline are not sufficiently definite for me to conclude a knowing, intentional violation by the required clear and convincing evidence.

### D. Prevailing party costs should be shifted; attorneys' fees should be borne by each side.

Finally, the Plaintiff asks that its attorneys' fees and costs incurred in this action be shifted to the Defendants under 10 *Del. C.* § 348(e). Section 348 sets up

---

[104] *Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1181 (Del. Ch. 2009).

[105] *Dickerson v. Castle*, 1991 WL 208467, at *3 (Del. Ch. Oct. 15, 1991).

[106] *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 6338996, at *1 (Del. Ch. Dec. 4, 2018). Clear and convincing evidence "is a higher evidentiary standard than a preponderance of the evidence, but is a lesser standard of proof beyond a reasonable doubt." *Amstel Assocs., L.L.C. v. Brinsfield-Cavall Assocs.*, 2002 WL 1009457, at *5 n.12 (May 9, 2002). That standard requires evidence that would lead a trier of fact to "an abiding conviction that the truth of the [factual] contention is 'highly probable.'" *In re Martin*, 105 A.3d 967, 975 (Del. 2014).

an expedited process for certain homeowners' association disputes. If that process is followed, under Section 348(e), "[t]he nonprevailing party at trial held pursuant to the provisions of this section must pay the prevailing party's attorney fees and court costs, unless the court finds that enforcing this subsection would result in an unfair, unreasonable, or harsh outcome."[107] Section 348(e) gives this Court "the discretion to deny fee shifting in whole, a discretion that includes the lesser power to conclude that whole hog fee shifting would be unfair, unreasonable, or harsh in the circumstances."[108]

For an action to be treated as expedited under Section 348, the Plaintiff needed to "attach to the complaint, a certification that the case is eligible to proceed under 10 *Del. C.* § 348[,]" as required in Court of Chancery Rule 174(c)(2). The Plaintiff failed to do so. And, as the procedural posture of this case reflects, this case proceeded in anything but expedited fashion. Section 348 fee shifting is unavailable, and the Plaintiff has failed to articulate any other exception to the American Rule.[109]

---

[107] 10 *Del. C.* § 348(e).

[108] *Swann Keys Ass'n v. Shamp*, 2008 WL 4698478, at *1 (Del. Ch. Oct. 10, 2008).

[109] *See Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998) ("Under the American Rule, absent express statutory language to the contrary, each party is normally obliged to pay only his or her own attorneys' fees, whatever the outcome of the litigation."). To the extent the Plaintiff is seeking bad faith fee shifting, it has failed to meet the heavy burden required. *See Donnelly v. Keryx Biopharmaceuticals, Inc.*, 2019 WL 5446015, at *6 (Del. Ch. Oct. 24, 2019) ("The Court typically will not find a litigant acted in bad faith for purposes of shifting attorneys' fees unless the litigant's conduct rose to the level of 'glaring egregiousness.'").

The Plaintiff is, however, entitled to costs under Court of Chancery Rule 54(d), where "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs."[110] This Court has defined a prevailing party as "the party who successfully prevails on the merits of the main issue or on *most* of her claims."[111] Here, the Plaintiff is the prevailing party, and costs should be shifted in its favor.

## III.    CONCLUSION

For the reasons stated herein, I find that the Defendants did not acquire title to the Common Area through adverse possession. I therefore find in favor of the Plaintiff on its trespass claim. An injunction should be issued requiring the Defendants to remove any property from the Common Area and barring them from continued trespass. Once possession is returned, the Plaintiff's remediation costs and expenses, if any, should be assessed against the Defendants as appropriate remedies for their unauthorized alterations. Each party should bear their own legal fees and

---

[110] At trial, Mr. Ptomey introduced and highlighted documentation showing attorneys' fees and expenses purportedly charged to the Unit by Stonebridge. *See* DX05. With this ruling, I expect the parties to meet and confer to address what charges are appropriately included within the limited cost shifting granted herein; if they cannot, they may seek relief through motion practice. To avoid any unnecessary delay, any request for relief must be filed within 30 days of this post-trial ruling becoming an order of the Court.

[111] *Adams v. Calvarese Farms Maint. Corp.*, 2011 WL 383862, at *3 (Del. Ch. Jan. 13, 2011) (emphasis in original).

expenses incurred in this action, but costs should be shifted to the Plaintiff as the prevailing party.

This is my final report, and exceptions may be filed under Court of Chancery Rule 144.

Respectfully submitted,

/s/ *Selena E. Molina*

Senior Magistrate in Chancery